# Staunton.

## CHARLES F. HAGAN, TRUSTEE, v. RICHMOND TRUST COMPANY, INC., ET ALS.

### September 22, 1927.

1. FIXTURES—*Rails—Intention.*—Rails laid on the right of way of a railroad company, only as incident to the use of the right of way and with no intention that they shall remain after the easement has terminated or been abandoned, are an exception to the general rule as to chattels annexed to realty, and retain their character of personalty, although affixed to the soil.

2. FIXTURES—*General Rule—Intention of Parties.*—The general rule that personal property attached to real estate becomes realty is always subject, among other tests, to the test of intention of the parties to make the article annexed a permanent accession to the freehold, and intention in this respect is gathered as well from the circumstances and purposes of the annexation as from the expressed intention of the parties.

3. FIXTURES—*Rails—Intention—Case at Bar.*—The instant case arose out of the question of priority between two trust deeds given by a lumber company on rails of the lumber company. The first trust deed, called the "Baltimore Trust," conveyed the timber rights in question to a trustee to secure the original purchase price. The grantor at the time owned no property except the timber and timber rights in question. The deed provided that any successor of the grantor should be bound by all the provisions of the trust. It also provided that the personal property and chattels conveyed should be taken to be real estate for the purposes of the indenture. Subsequently the grantor conveyed the timber and timber rights in question to a lumber corporation. The lumber company, however, did not assume the "Baltimore Trust," but took the property conveyed subject to it. The lumber company agreed to install a sawmill outfit on or near the boundary of land and did install such outfit near the boundary of land and built railroad tracks from the mill into the boundary of land. Subsequently the lumber company executed a deed of trust, called the "Richmond Trust," on all the steel rail owned by the lumber company to secure another debtor. There was no intention that the rail should remain after the oper-

ations ceased. The trustee in the "Baltimore Trust" accepted subsequent liens upon the identical rail in question covered by the "Richmond Trust," in one of which, at least, it was expressly declared that the rail was subject to the prior lien of the "Richmond Trust."

*Held:* That there was no error in a decree declaring that the "Richmond Trust" was a first lien on the steel rail.

4. MORTGAGES AND DEEDS OF TRUST—*Operating Mortgage—Priorities Between Trust Deeds—Right to Sell or Dispose of Timber Products "In Due Course of Business"—Execution of Trust Deed to Secure a Debt—Case at Bar.*—The grantor in a deed of trust of timber and timber lands to secure the purchase price of land and timber reserved the right to sell and dispose of the timber products and lumber produced "in due course of business" until default. The grantor's successor gave a trust deed to secure another debt, and it was contended that any sale made by the grantor's successor passed a good title to the purchaser under this provision as to the right to sell and dispose of timber and timber products, and that the trustee in the second deed of trust was a purchaser within the meaning of this clause, and therefore the first trust was not a first lien on any part of the lumber conveyed by grantor's successor to a trustee to secure a debt.

*Held:* That the power of grantor or his successor to dispose of manufactured lumber was limited to a disposition "in due course of business" and did not contemplate that the grantor or its assigns could convey to a trustee to secure a debt.

5. FRAUDULENT AND VOLUNTARY CONVEYANCES—*Mortgages and Deeds of Trust—Operating Mortgage—Reserving Right to Dispose of Products—Case at Bar.*—Trust deeds of timber and lumber reserved to the grantor until default possession of all the property assigned to the trustee and the right to cut, manufacture and dispose of all timber cut or manufactured on the boundary. There was no claim that the debt secured was not a *bona fide* debt, and the deed created a sinking fund, provided for the payment of interest on the bonds secured, at stated intervals, and strict accounting to the trustee of timber cut or manufactured.

*Held:* Under the authority of *Mathews* v. *Bond,* 146 Va. 158, 135 S. E. 689, that the trust deed was not *per se* fraudulent under section 5184 of the Code of 1919.

6. APPEAL AND ERROR—*Cost of Former Suit Between the Same Parties—Presumption of Correctness of Lower Court's Decision.*—In the instant case, a suit asking for the appointment of a receiver of a corporation as hopelessly insolvent, it was alleged as error that the trial court erred in directing any part of the funds under its control to be paid to officers for costs in a former case, a suit having practically the

same objects as the instant suit and involving the same parties. There was no argument of the question in the briefs and no reference to any evidence which would enable the Supreme Court of Appeals to pass upon the merits of the assignment.

*Held:* That in view of the finding and action of the lower court, and in the absence of anything in the record to show error, the Supreme Court of Appeals must assume there was no error, and that the lower court did not abuse the discretion vested in it in such matters.

Appeal from a decree of the Circuit Court of Wise county, in consolidated suits against a lumber corporation. From the decree complainant in one of the suits appeals.

*Affirmed.*

The opinion states the case.

*J. S. Ashworth,* for the appellant.

*Wirt P. Marks, Jr.,* and *Hunton, Williams, Anderson & Gay,* and *S. W. Coleman,* for the appellees.

CHICHESTER, J., delivered the opinion of the court.

This suit was instituted in the Circuit Court of Wise county by the Richmond Trust Company, a corporation, and E. Randolph Williams, trustee, against Dungannon Lumber Company, Incorporated, with its principal office at Big Stone Gap, Wise county, Virginia, and others, the main objects of the suit being to have the court appoint receivers for the defendant company which was then in a hopelessly insolvent condition; to take an account of the claims and liens against the lumber company, to liquidate and convert its unliquidated property into cash, and distribute it among its creditors in order of their priority, and to establish the claim of the complainants as a first lien upon the property of the defendant company mentioned and

described in a certain deed of trust bearing date February 12, 1918, and hereinafter designated as the "Richmond Trust," from the Dungannon Lumber Company, Incorporated, to E. Randolph Williams, trustee. There are two main controversies which are before us upon this appeal.

(1) The question of priority of lien, as between the Richmond Trust Company on the one hand and what is referred to in the record as the "Baltimore Trust," upon certain steel rail, logging engine, logging cars, etc., described in the "Richmond Trust."

(2) The question of priority of lien as between the "Baltimore Trust" and what are described in the record as the "Dunn Trust" and the "Pennington Trust" on the one hand, and the "Coleman Trust" on the other, upon certain lumber and certain steel rail, being the same rail referred to in the "Richmond Trust."

The trial court decided the first question in controversy in favor of the contention of the "Richmond Trust." Upon the second question the court held that the "Baltimore Trust" was a superior lien to the "Coleman Trust" on seventy per cent of the lumber or its proceeds, and that the "Dunn" and "Pennington Trusts" were superior to the "Coleman Trust" on the steel rail.

(1) The facts out of which the first proposition in controversy grew are necessarily preliminary to the second controversy, as will be seen later, and are fairly stated in the brief of the Richmond Trust Company, in substance, as follows:

By deed dated June 7, 1909, Patrick Hagan and wife conveyed to A. Kyle Morison the timber and timber rights on a large boundary of land in Scott and Wise counties, Virginia. It appears from the recitals in the deed, dated November 7, 1913, from Charles F. Hagan, trustee, to Clinchland Timber Corporation, that Mori-

son in turn conveyed to R. T. Irvine and that Irvine in turn conveyed to Clinchland Timber Corporation. It likewise appears from those recitals that on January 27, 1911, Patrick Hagan and wife constituted Charles F. Hagan their attorney in fact to act for them in all matters pertaining to their real estate and interests therein in the State of Virginia, and that by deed dated February 23, 1912, Patrick Hagan and wife conveyed to Charles F. Hagan, as trustee, all their real estate and interests therein in the State of Virginia. From the same source it appears that negotiations ensued between Charles F. Hagan, trustee, and the Clinchland Timber Corporation, which resulted in the deed of November 7, 1913, from Charles F. Hagan, trustee, to the Clinchland Timber Corporation. By the last mentioned deed, Charles F. Hagan, trustee, conveyed to the Clinchland Timber Corporation "all of the merchantable timber, trees of specified circumference, upon a boundary of land containing 23,152.21 acres, more or less, less the timber upon the tracts aggregating 3,436.89 acres included in that boundary." This deed provided in paragraph "fifth" thereof, that the timber corporation released, conveyed and retransferred to Hagan, trustee, all properties, rights and privileges mentioned in the deed of June 7, 1909, from Patrick Hagan and wife to A. K. Morison, which were different from those set out in the deed of November 7, 1913, from Hagan, trustee, to the timber corporation, and provided that the timber corporation, its successors and assigns, "shall and will hold the properties, rights and privileges hereinbefore in this deed mentioned, under and subject to the terms and conditions of this deed and none other." (This eliminates the deed and all the terms thereof from Hagan and wife to Morison, above referred to, from further consideration in de-

termining the rights of the parties in this controversy, and the trial court correctly so ruled.)

By deed of trust from Clinchfield Timber Corporation to the Safe Deposit and Trust Company of Baltimore, Maryland, trustee (referred to hereinafter as the "Baltimore Trust"), the Clinchfield Timber Corporation conveyed to the trustee the timber rights which it acquired under the deed of November 7, 1913, from Hagan, trustee. This deed of trust secured an issue of $250,000.00 of bonds of the timber corporation and the phase of the case with which the Richmond Trust Company is concerned is between Hagan, trustee, as the owner of bonds issued under this deed of trust, on the one hand, and the Richmond Trust Company, as holder of an unpaid note secured by the deed of trust to E. Randolph Williams, trustee (the "Richmond Trust"), heretofore mentioned, on the other.

By an agreement dated October 25, 1913, between the Clinchland Timber Corporation and the Dungannon Lumber Company, the timber corporation sold to the Dungannon Lumber Company a part of the timber and timber rights which Hagan, trustee, conveyed to the Clinchland Timber Corporation by his deed of November 7, 1913, which part so conveyed was located in Scott county, Virginia. After describing the timber conveyed, that agreement provided:

"* * * the said party of the second part takes the same subject to all the terms, conditions and agreements made in the aforesaid deeds to said party of the first part, and subject also to the terms and conditions of a certain deed of trust or mortgage from the said party of the first part to the Safe Deposit and Trust Company of Baltimore, State of Maryland, likewise bearing date of July 1, 1913, and of record in the Scott county clerk's office."

The Dungannon Lumber Company did not assume payment and performance of the obligations of the "Baltimore Trust," but took the timber subject to the lien and conditions of that trust. By that agreement the Dungannon Lumber Company agreed to pay the Clinchland Timber Corporation, as compensation for the property sold, $4.50 per thousand feet for all logs cut from the boundary. This agreement was never recorded and it is admitted that the Richmond Trust Company had no actual knowledge of its existence.

At the time the Clinchland Timber Corporation executed the Baltimore deed of trust, and at the time it entered into the agreement of sale with the Dungannon Lumber Company, it owned no property except the timber and timber rights acquired by the deed from Hagan, trustee, dated November 7, 1913. The Clinchland Timber Corporation never owned the lumber mill or equipment or any logging roads, engines, rail or track, or any personal property of any kind or description. The plant and equipment and the logging engines and cars and the steel rail in the logging tracks were acquired by the Dungannon Lumber Company from other parties. In fact, the mill and equipment and about one-third of all the steel rail in the logging track were located on land leased or otherwise acquired from other parties, while about two-thirds of the rail were laid on the land upon which the boundary of timber conveyed by Hagan, trustee, to the Clinchland Timber Corporation stood, and no part of the logging track had been constructed or the steel rail laid when the "Baltimore Trust" was given.

In 1918 the Dungannon Lumber Company required funds for use in its business and it negotiated a loan of $25,000.00 from the Richmond Trust and Savings Company, whose name was subsequently changed to Rich-

.mond Trust Company, to evidence which it gave its five negotiable notes for $5,000.00 each and secured payment thereof by deed of trust dated February 12, 1918, to E. Randolph Williams, trustee, upon the steel rail of the Dungannon Company, a Climax logging locomotive and ten logging cars. This deed was recorded on March 7, 1918, and is the deed under which the Richmond Trust Company claims its lien for the balance due of $4,500.00 with interest.

It seems important to set out more specifically the contents of the deeds heretofore briefly referred to, in order to clarify the contentions of the parties upon this issue.

(1) The deed from Hagan, trustee (November 7, 1913), conveyed to the Clinchland Timber Corporation (a) all merchantable trees sixty inches or more in circumference, on certain described boundaries of land in Scott and Wise counties, containing 23,152.21 acres, more or less. (b) The easements of necessary rights of way, and the privilege of selecting and using any and all lines, routes and locations for construction of drag roads and steam roads, wagon roads, etc., for cutting, logging and transporting the timber, with the right to use so much of the surface of the land as is necessary for lumber yards and sawmill sites. All rights and privileges to last as long as is necessary to remove the timber conveyed, not to exceed, however, forty years. It is then provided that when any watershed has been cut over it shall not be cut over again but is released to the grantor, except as to rights of way necessary to remove other timber. The party of the first part retains a lien upon all the properties conveyed by the deed to secure the payment of all sums to become due. The grantee also released to Hagan, trustee, all rights under the Morison deed, *supra*, different from those contained in this deed.

We have gone somewhat into detail with reference to what this deed conveyed because it establishes just what the Clinchland Timber Corporation owned and also what it conveyed in the next deed to be considered (the deed from the timber corporation to the Safe Deposit Company of Baltimore [the "Baltimore Trust."])

(2) The deed of trust from the Clinchland Timber Corporation to the Safe Deposit and Trust Company of Baltimore, Md. (July 1, 1913), provided for the issue of $250,000.00 of coupon bonds, part of which, at least, was for the payment of the purchase price of the property conveyed by deed No. 1, and mortgaged all the property conveyed by that deed to pay the bonds, as they came due, and the interest. A sinking fund for this purpose was provided for by requiring the timber company to pay to the trustee $3.50 per thousand feet of timber cut and removed from the properties, payable on the 15th of every April, July, October and January in each year.

It is provided that any successor to the timber corporation shall be bound by all the provisions of the trust and shall have all the rights of the timber corporation. The deed provides for foreclosure of the trust in case of default, upon notice of fifty-one per cent of the bondholders, and it provides also that in case of default the trustee may take possession of the premises and properties and operate them.

It is then provided that the personal property and chattels conveyed shall be taken to be real estate for the purposes of this indenture and be held as fixtures and appurtenances of the real estate and part thereof and to be sold therewith.

There is a provision that the obligations under the trust are solely corporate and not individual.

Another section of the trust deed gives the timber

corporation and its successors the right to dispose of the timber products and lumber produced in due course of business until default.

It is also provided that all stipulations shall bind the successors of the timber corporation as well as the grantee.

(3) On October 25, 1913, the Clinchland Timber Corporation entered into an agreement with the Dungannon Lumber Company by which it sold a part of the timber and timber rights acquired by the former from Hagan, trustee, Irvine and wife and Morison, that is the timber on the watersheds of Little Stony creek, Dry creek and Magee creek, and all the rights, privileges, etc., acquired by the timber company to the timber and timbering rights which had been vested in the timber company by those deeds, and the Dungannon Lumber Company took the timber and rights pertaining thereto subject to the terms and conditions of the deed from Hagan, trustee, to the timber company, *supra,* and subject also to the terms and conditions of the "Baltimore Trust," *supra.* The lumber company did not, however, assume the "Baltimore Trust," but took the property conveyed subject to it, and agreed to pay for the timber and timbering rights $4.50 per thousand feet for log measure of the timber at the mill. The lumber company agreed to install a complete sawmill outfit or outfits on or *near* (italics supplied) the boundary of land.

It is·well to remark here that the Dungannon Lumber Company, as shown by the record, did, after this date, install a large sawmill outfit near the boundary of land, but not on it, and built railroad tracks from the mill into the boundary of land where the timber was located, using, in the construction of the railroad, steel rail which it purchased from the Carnegie Steel Corporation. One-third of the steel rail was laid on land which the

lumber company acquired from other parties and about two-thirds upon the land upon which the timber acquired from the timber company grew.

(4) Under these circumstances the Dungannon Lumber Company, on February 12, 1918, executed a deed of trust to E. Randolph Williams, Trustee, to secure to the Richmond Trust Company the payment of five $5,000.00 notes ("Richmond Trust," *supra*) and conveyed to the trustee for this purpose all the steel rail owned by the lumber company, consisting of six or seven miles of rail aggregating 350 tons of thirty-pound steel rail laid on the mill yard and log roads of the Dungannon Lumber Company, together with locomotive, logging cars, etc., describing them.

The first controversy which we will have to determine upon this appeal grows out of the contention upon the part of Hagan, Trustee, that the steel rail conveyed in the "Richmond Trust" is subject to the alleged prior lien in his favor under the "Baltimore Trust." His contention is, not that the steel rail were in terms included in the "Baltimore Trust," but that by agreement of the parties all property acquired by the Clinchland Timber Corporation was to be treated as realty, and that the parties contemplated a complete sawmill outfit which would be attached to real estate and when attached would become a part thereof and subject to the deed of trust ("Baltimore Trust") to secure the original purchase price, and that therefore appellant is entitled to priority in the proceeds of the property subject to the "Richmond Trust" over the Richmond Trust Company.

The contention of appellant rests upon four propositions.

1. That all the property rights owned by the Clinchland Timber Corporation were made realty by agreement of the parties.

2. That the "Baltimore Trust" covered all this property, and provided that any successor to the Clinchland Timber Corporation should take subject to the terms of that trust.

3. That the Dungannon Lumber Company purchased the property subject to the "Baltimore Trust," and attached the steel rail and, in effect, its entire plant to the real estate.

4. That the steel rail and sawmill outfit when attached to the realty became realty and subject to the "Baltimore Trust."

Propositions 1, 2 and 3 may be admitted as true, although in purchasing subject to the lien and conditions of the "Baltimore Trust" the lumber company did not assume payment or performance of the obligations of that trust, and it is essential that the fourth proposition also be true. Indeed, it was admitted in the oral argument and is admitted in the brief that if the rail which formed part of the log roads and of the rights of way did not become real estate when attached thereto, then the contention of appellant fails and the "Richmond Trust" has priority over the "Baltimore Trust" so far as the property conveyed by the "Richmond Trust" is concerned.

To sustain the contention of appellant that the steel rail became realty and subject to the lien of the "Baltimore Trust" when they were laid on the rights of way which the timber company acquired from appellant, we are cited to *Green* v. *Phillips,* 26 Gratt. (67 Va.) 752, 21 Am. Rep. 323, and *Shelton* v. *Ficklen, Trustee,* 32 Gratt. (73 Va.) 727. These cases involve fixtures and equipment in connection with manufacturing plants, one a sash, door and blind factory, and the other a flour mill, and are in accord with the general rule touching fixtures or property attached to real estate.

[1] The rights of priority of the parties here, under the facts of this case as narrated above and the title papers, are determined by the decision of this court in *Talley, etc.* v. *Drumheller, etc.,* 143 Va. 439, 130 S. E. 385. That case was an action by the owners of the land over which certain rights of way had been acquired for the construction of a tramroad to transport ore to the railroad station, and was brought against the owners of the tramroad to recover the steel rails used in its construction. The mining operations had been discontinued, and the plaintiffs claimed that the right of way for the tramroad having been abandoned, the rails, being attached to the freehold, were part thereof, and reverted to the owners of the servient estate. In denial of the soundness of this claim, Judge Burks, speaking for the court, said: "Rails laid on the right of way of a railroad company, only as incident to the use of the right of way and with no intention that they shall remain after the easement has terminated or been abandoned, are an exception to the general rule as to chattels annexed to realty, and retain their character of personalty, although affixed to the soil. It is sometimes said that they are in the nature of trade fixtures, though the cases are not always placed on that ground." Citing numerous authorities.

[2] But the general rule referred to by Judge Burks is always subject, among other tests, to the test of intention of the parties to make the article annexed a permanent accession to the freehold—and intention in this respect is gathered as well from the circumstances and purposes of the annexation as from the expressed intention of the parties. See 11 R. C. L., page 1059, section 3, *et seq.;* 26 C. J., page 654, section 2, and cases cited.

[3] The facts of the instant case showing the circumstances and purposes of the annexation not only do not show any intention on the part of the parties here that the rail should remain after the operations had ceased and the easements terminated, but the whole record and the conduct of the parties clearly show the contrary.

It is not necessary to recite in full here the evidence which supports this conclusion. It abundantly appears from the elaborate statement of facts heretofore made. Suffice it to say that the "Baltimore Trust" did not, by its terms, embrace steel rail, logging engines or logging cars, and the plant had not been located at the time of the execution of the "Baltimore Trust," and never was located on the Hagan land, nor did the Clinchland Timber Corporation ever own any steel rail, and could not have given, much less intended to give, a lien upon them. All these things have a tendency to negative any idea that there was any intention that equipment used in removing the timber should remain on the premises after the operation closed. This conclusion as to intention is further strengthened by the fact that Hagan accepted subsequent liens ("Dunn and Pennington Trusts") upon the identical rail, logging cars, etc., covered by the "Richmond Trust," in one of which, at least, it was expressly declared that the rail were subject to the prior lien of the "Richmond Trust."

We hold, therefore, that there was no error in that part of the decree declaring the "Richmond Trust," after payment of the Carnegie Steel Company's claim, a first lien on the steel rail mentioned in that trust.

(2) By deed of trust bearing date October 1, 1918, the Dungannon Lumber Company conveyed its sawmill outfit and all equipment to James S. Dunn,

trustee, to secure to Charles F. Hagan, trustee, the payment of an indebtedness of $44,316.05. Included in the conveyance, but subject to the prior lien of the "Richmond Trust," *supra*, were about 425 tons of steel rail, all "being the same property owned and used by the Dungannon Lumber Company in or near Dungannon, Virginia."

On December 26, 1921, the Dungannon Lumber Company conveyed to Robert L. Pennington, trustee, all the timber purchased from the Clinchland Timber Corporation on Little Stony creek, McGhee creek and Dry creek, in Scott county, sawmill and entire sawmill outfit, thirteen miles of thirty pound steel rail (585 tons), its easements and rights, to secure to Charles F. Hagan, trustee, the payment of $20,000.00.

This deed of trust contains the following clauses:

"The said Dungannon Lumber Company, for itself, its successors and assigns, doth hereby further covenant and agree with the said trustee and the holders of said notes that it will pay over to the said trustee, for the benefit of the holders of said notes, the sum of five ($5.00) dollars per thousand for every thousand feet of lumber shipped, sold or disposed of from the Dungannon Lumber Company's yards, two ($2.00) dollars of which shall be applied upon the said $20,000.00 herein secured as long as the same, or any part thereof, remains unpaid, and three ($3.00) dollars of said sum to be applied on other notes and obligations due the said Charles F. Hagan, trustee, and secured in part by deeds of trust on a portion of the property herein conveyed, and in part by other collateral, which last named debt and notes are set out in a separate memorandum, copies of which are held by the Dungannon Lumber Company, Robert L. Pennington, trustee, and Charles F. Hagan, trustee.

"Said party of the first part further covenants and agrees to furnish to the said Robert L. Pennington, trustee, and Charles F. Hagan, trustee, a list of all sales made and the number and initials of all cars in which the same has been shipped, within ten days after the first day of each month, and covenants and agrees to pay over to the said Robert L. Pennington, trustee, or his successors, within twenty days after the end of each month, the several sums of money which shall become due and payable under the provisions of this deed of trust. It is mutually agreed and understood that the said Robert L. Pennington, trustee, or his successor, and the said Charles F. Hagan, trustee, or his successor, shall have the right at all times to examine the books of the Dungannon Lumber Company and the transportation company to verify the said shipments. Whenever there has accrued in the hands of said trustee, under the provisions of this deed of trust, a sum equal to five per cent of the original indebtedness secured hereby, out of the monies to be turned over to said trustee, from sale of lumber from the $2.00 per thousand feet which is to be applied to the debt secured hereby of $20,000.00, and whenever there has accrued a like sum of five per cent to be applied on other notes referred to in schedule of debts under the provisions of $2.00 per thousand feet, the said trustee shall disburse said funds ratably to the holders of said notes and indebtedness, and when paid by said trustee to the holders thereof shall be credited upon said notes as of date of disbursement. All funds received by the said trustee, under the terms of this deed of trust, in any manner shall be deposited by the said trustee to his credit as such in the bank of Bristol, Tennessee, and paid out by check as hereinbefore provided."

' Then follows the clause providing for sale in case of default:

On June 20, 1923, the Dungannon Lumber Company conveyed to S. W. Coleman, trustee, all the lumber now on its mill yard located at Dungannon, Virginia, and leased the yard by written lease to S. W. Coleman.

It also conveyed by this deed of trust its mill and mill equipment, including logging locomotives and all its steel rail located at the mill or connected with its logging operations.

This conveyance was made to secure the holders of six certain notes for $5,000.00 each.

Then follows the provision for sale in case of default.

In addition to the deed of trust and the lease referred to there was an agreement entered into between the parties that if payment of the $30,000.00 was made as agreed to, the title to the lumber should revert to the Dungannon Lumber Company. This agreement concluded with this clause: "It is understood and agreed, however, that unless and until default is made in the payment of the said notes, the party of the first part may from time to time, in the due course of business, ship lumber from said mill yard to market and shall at the same time substitute other lumber for the lumber so shipped, and shall at all times keep on said yard not less than one and one-half million feet of lumber; and if default be made in the payment of said notes in accordance with the terms of the aforesaid trust deed, then the party of the first part shall cease to ship lumber from the said yard and the party of the second part take possession of the said yard."

It will thus be seen that Hagan, trustee, subject to the rights of the beneficiary under the "Richmond Trust" as to the property thereby conveyed, had the following liens on the Dungannon Lumber Company

property in Scott county (if the "Baltimore Trust" and the "Pennington Trust" were not self-destructive, as is contended by Coleman, trustee, as will hereafter appear), to-wit:

Under the "Baltimore Trust" on all property as heretofore enumerated, conveyed by the Clinchland Timber Corporation to the Dungannon Lumber Company.

Under the "Dunn Trust" all the property as heretofore enumerated, conveyed by the Dungannon Lumber Company to Dunn, trustee.

Under the "Pennington Trust" all the property as heretofore enumerated, conveyed by the Dungannon Lumber Company to Pennington, trustee.

There is no question as to the priority in time of the three foregoing deeds of trust over the "Coleman Trust." Coleman, however, claims priority over these trusts as to the property described in his deed for several reasons hereinafter enumerated. The trial court held, in the decree complained of, that the "Baltimore Trust" was a lien in favor of Hagan, trustee, on all the timber on the boundaries of land described in that deed, and lumber sawed therefrom, and the proceeds therefrom which came into the hands of the receivers, and that the deed of trust was not *per se* fraudulent; that the "Dunn and Pennington Trusts" were liens on all the property in those deeds described (subject to the prior lien of the "Richmond Trust" when the same properties were involved), and that the "Pennington Trust" deed was not *per se* fraudulent; that of the lumber which came into possession of the receivers, thirty per cent thereof was not cut from timber which the Dungannon Lumber Company owned, on land described in the deed from Hagan, trustee, to the Clinchland Timber Corporation, and in the con-

tract between that corporation and the Dungannon Lumber Company, and that therefore the "Pennington Trust" is not a lien on thirty per cent of the lumber, but that the "Coleman Trust" was a first lien on this thirty per cent; that the "Pennington Trust" is a first lien on seventy per cent of the lumber.

The effect of the court's holding, summarized is, that the "Coleman Trust" is not *per se* fraudulent, and that it is a first lien on thirty per cent of the lumber which came into the hands of the receiver and upon such property of the Dungannon Lumber Company conveyed thereby and described therein, as was not subject to the three deeds of trust, prior thereto in date, in which Hagan, trustee, was beneficiary, 'and this property (subject to the "Coleman Trust"), the court designates as "certain logging cars which sold for $207.00." Coleman, trustee, assigns three errors with respect to the above findings of the court:

1. That the court erred in holding that the "Baltimore Trust" constituted a superior lien to that of the "Coleman Trust" on seventy per cent of the timber or its proceeds. With respect to this assignment it is contended that, as the "Baltimore Trust" contained a clause giving the Clinchland Timber Corporation, its successors, etc., the unrestricted right to retain actual possession of all property thereby conveyed, to cut, manufacture, carry away, consume, sell and dispose of all timber taken from the timber thereby conveyed; that as any sale made by the Dungannon Lumber Company of lumber passed a good title to the purchaser, and that, as S. W. Coleman, trustee, was a purchaser within the meaning of this clause, therefore the "Baltimore Trust" is not a first lien on any part of the lumber conveyed by the "Coleman Trust," but that all of it is subject to the "Coleman Trust" as a first lien.

[4] This contention of Coleman, trustee, cannot be sustained. We think the "Baltimore Trust" was sufficiently broad in its terms to embrace manufactered lumber as well as standing timber, and that the power given to the Clinchland Timber Corporation, its successors or assigns, to dispose of manufactured lumber, was limited to a disposition in due course of business and did not contemplate that the Timber Corporation or its assigns could convey to a trustee to secure a debt or convey as the lumber company did in the "Coleman Trust" and defeat the rights of the beneficiaries under the "Baltimore Trust." This paragraph, appearing in the "Baltimore Trust," is conclusive of this contention, we think: "The timber corporation shall have full power from time to time in its discretion to dispose of manufactured lumber and timber products *in due course of business* (italics supplied) free from the lien hereof." The conveyance to Coleman, trustee, was not a conveyance in due course of business but was a conveyance to secure a debt.

2. It is charged that the court erred in holding that the "Coleman Trust" constituted a lien on thirty per cent of the proceeds of the lumber which went into the hands of receivers. If the "Coleman Trust" is not *per se* fraudulent (a question which will be later disposed of), for reasons given with reference to assignment of error No. 1, there is no error in the finding of the trial court. The evidence as to the quantity of lumber manufactured by the lumber company from the Hagan tract, and as to the quantity manufactured from other lands by the Dungannon Lumber Company, while not entirely clear, seems to sufficiently support the finding of the court. There is no merit in this assignment.

3. It is charged that the court erred in holding that Hagan, trustee, had a lien under the "Dunn and Pennington Trusts" on all the steel rail, superior to the

"Coleman Trust." The ground of this contention is that there was evidence to the effect that certain steel rail were acquired by the Dungannon Lumber Company after the date the "Dunn and Pennington" trust deeds were executed, and that these rail were embraced in the "Coleman Trust." As to this, it is sufficient to say that an examination of the deeds themselves does not justify this conclusion and the evidence relied on does not support it. There is no merit in this assignment.

[5] 4. It is contended that the "Coleman Trust" is a first lien upon the property thereby conveyed except as to property covered by the "Richmond Trust," because the "Baltimore Trust" and the "Pennington Trust" are *per se* fraudulent and void, for the reason, as to the "Baltimore Trust," that the provisions of that trust reserved to the grantor not only possession, but the complete right to carry away, consume, sell and dispose of the timber and lumber subject to the trust. In other words, the contention is, that it reserved to the grantor powers inconsistent with the objects of the deed, and that it is void under section 5184 of the Code. The provision referred to is as follows:

"Section 1. Until some default shall have been made in the due and punctual payment of the principal of the bonds hereby secured, or in the due and punctual performance and observance of some covenant or condition hereof, obligatory upon the timber corporation, and until such default shall have been continued beyond the period of grace, the timber corporation, its successors and assigns, shall be suffered and permitted to retain actual possession of all the property conveyed, mortgaged or assigned to the trustee, and to manage, operate and use the same and every part thereof, with

the rights appertaining thereto, and to collect, receive, take, use and enjoy the earnings, income, rents, issues and profits thereof, and without impeachment of waste, to cut, manufacture, carry away, consume, sell and dispose of all timber taken, cut or manufactured thereon or therefrom."

We are referred to the following decisions as sustaining this contention. *Consolidated Tramway Company v. Germania Bank*, 121 Va. 331, 93 S. E. 572; *Gray, Assignee* v. *Atlantic Trust & Deposit Co.*, 113 Va. 580, 75 S. E. 226; *Hughes, Effinger & Co.* v. *Epling*, 93 Va. 424, 25 S. E. 105; *Catt* v. *Knabe, etc., Mfg. Co.*, 93 Va. 736, 26 S. E. 246; *Saunders* v. *Waggoner*, 82 Va. 316; *Wray* v. *Davenport*, 79 Va. 19; *McCormick* v. *Atkinson*, 78 Va. 8; *Perry* v. *Shenandoah National Bank*, 27 Gratt. (68 Va.) 755; *Quarles* v. *Kerr*, 14 Gratt. (55 Va.) 48; *Addington* v. *Etheridge*, 12 Gratt. (53 Va.) 436; *Sheppard* v. *Turpin*, 3 Gratt. (44 Va.) 373; *Long* v. *Lee*, 3 Randolph (24 Va.) 410.

There is no claim, however, that the debt secured is not a *bona fide* debt, and the deed provides for the payment, at stated intervals, of interest on the bonds secured, at the rate of six per cent per annum. It further provides for the creation of a sinking fund for the benefit of the bondholders, by paying to the trustee on the 15th of each month the sum of $3.50 per thousand feet of timber cut and removed from the premises, and it provides for a strict accounting to the trustee every three months of all timber cut and removed during the preceding three months. There is a provision empowering the trustee to take possession of the entire works of the timber corporation or its successors, in event that these provisions are not complied with, and there are other provisions, not necessary to enumerate, in view of the foregoing, for the protection of the grantee. In view of these provisions, it is only neces-

sary to say that the "Baltimore Trust" comes within the decision of this court in the recent case of *Mathews v. Bond*, 146 Va. 158, 135 S. E. 689.

With respect to the "Pennington Trust" quotations heretofore made therefrom demonstrate that it was given to secure the payment of a *bona fide* indebtedness; that it provides for a strict accounting of all lumber manufactured by the Dungannon Lumber Company, and payment to the trustee of "the sum of $5.00 per thousand for every thousand feet of lumber sold or disposed of from the Dungannon Lumber Company's yards, two dollars of which shall be applied upon the $20,000.00 herein secured as long as the same, or any part thereof, remains unpaid, and three dollars of said sum to be applied to other notes and obligations due the said Charles F. Hagan, trustee." *Mathews v. Bond, supra*, is controlling so far as the "Pennington Trust" is concerned also. In that case, Judge Campbell, speaking for the court, said: "In construing the deed of trust, the provision under attack must be read in connection with all the other provisions of the instrument. In reading the deed it is to be observed that the debt secured was payable two years after date, unless the grantor defaulted in the payments, failed to insure the property, or failed to pay taxes thereon. It also provided for an accounting each month of the proceeds derived from the sale of lumber and ties, and in the event of a failure upon the part of the grantor so to do, then the entire debt should become due and payable. No power of revocation was reserved by the grantor.

"Upon the happening of any of the contingencies mentioned the trustee was empowered to take charge of all the lumber and ties and make sale of the same.

"A noticeable feature of the trust deed, which distinguishes it from most cases, is that the grantor had

no power to sell the standing timber, as such, but must convert the same into lumber. It is hard to conceive how the business of the corporation could be successfully conducted unless granted the leeway of operation of its plant. And again, it is to be observed that the proceeds were carefully guarded against consumption by the operation, in that ten dollars per thousand feet was to be paid from the sale of lumber, and five dollars per thousand feet from the proceeds of the ties.

"The deed of trust is, in strict legal terminology, an operating mortgage. By its execution the grantor was afforded a source of credit, while the beneficiary was afforded a security for his debt. No harm was done to subsequent creditors as they necessarily extended credit to the grantor only on the value of the equity of redemption and not upon the corpus of the estate. The law afforded them a means by which they could enforce their debts, subject only to the terms of sale contained in the trust deed."

All that is there so well said is applicable to the trust deeds here being considered, and we conclude that they are not void under section 5184 of the Code and that the court did not err in holding them valid and in establishing them as liens upon the property of the Dungannon Lumber Company described therein, as set out in the final decree and as heretofore indicated.

Hagan, trustee, attacks the "Coleman Trust" as *per se* fraudulent under section 5184 of the Code, but as Hagan's rights have been held superior to the "Coleman Trust" on all property of the Dungannon Lumber Company on which he has a lien by virtue of the "Baltimore," "Dunn" and "Pennington Trusts," it is not necessary to decide whether the "Coleman Trust" is invalid, as alleged, or not, as no other creditor is here complaining of the "Coleman Trust," and Hagan,

trustee, is not injured by its existence, whether valid or invalid. We have given careful consideration to the question of the validity of the "Coleman Trust," however, and we agree with the conclusion of the trial court that the deed is not invalid as alleged. *Mathews v. Bond, supra; Acadian Coal & Lumber Co. v. Brooks Run Lumber Co.*, 88 W. Va. 595, 107 S. E. 423.

[6] One other question arises, which merits attention. It is alleged as error that the trial court erred in directing any part of the funds under its control to be paid to officers for costs in the former case. (A suit having practically the same objects as the instant suit and involving the same parties was instituted by Charles F. Hagan, trustee, against Dungannon Lumber Company, and a demurrer to the bill filed therein was, upon appeal to this court, sustained and the cause remanded to the circuit court for settlement of the accounts of the receivers and for such decree as was proper. *Hagan v. Dungannon*, 145 Va. 568, 134 S. E. 570.) It was for payment of the costs of officers in this cause that complaint is now made.

Upon this proposition it seems only necessary to say that there is no argument of the question in the briefs and no reference to any evidence which will enable us to pass upon the merits of the assignment.

The trial court, however, in its final decree, held that the two causes could be disposed of equitably and to the best advantage by hearing them together; that is, settling the old receivers' account, in the instant suit, and after reciting what had been done by the receivers in the first cause, and directing the fees of the receivers to be paid out of funds in hand, in both cases, the court adds: "And it also appearing to the court that, by agreement, the parties to the second mentioned cause have had and received the benefit of the work and

report of Q. C. Counts, commissioner, as aforesaid, and the benefit of the work, time and attention of said receivers in said first cause as well as in the second mentioned cause, all of which the court here finds, and so accordingly adjudges and decrees."

In view of this finding and action of the court, and in the absence of anything in the record to show error therein, we must assume that there was no error, and that the court did not abuse the discretion vested in it in such matters.

Upon the whole case we are of opinion to affirm the decree of the circuit court.

*Affirmed.*